# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br>EFRAIN A. RIVERA SOLER and BRENDA L. NIEVES CASTRO<br>Debtors | Case No. 09-09654 (ESL)<br>Chapter 11 |

## DEBTORS' DISCLOSURE STATEMENT DATED SEPTEMBER 1, 2010

*Table of Contents*

I.   INTRODUCTION. ........................................................................................................................ 3
     A.   Purpose of This Document. ............................................................................................. 4
     B.   Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing. ..................... 4
          1.   **Time and Place of the Hearing to finally approve this Disclosure Statement and Confirm the Plan.** ................................................................................. 4
          2.   **Deadline For Voting to Accept or Reject the Plan.** ........................................ 4
          3.   **Deadline For Objecting to the Adequacy of Disclosure and Confirmation of the Plan.** ................................................................................... 5
          4.   **Identity of Person to Contact for More Information.** ..................................... 5
     C.   Disclaimer. ...................................................................................................................... 5
II.  BACKGROUND. ......................................................................................................................... 5
     A.   Description and History of the Debtors and their Business. ........................................... 5
     B.   Property of the Debtors. .................................................................................................. 6
     C.   Pending Litigation. .......................................................................................................... 7
     D.   Insiders of the Debtors. ................................................................................................... 8
     E.   Events Leading to Chapter 11 Filing. .............................................................................. 9
     F.   Significant Events During the Bankruptcy Case ............................................................ 9
     G.   Projected Recovery of Avoidable Transfers. ................................................................ 10
     H.   Claims Objections. ........................................................................................................ 10
     I.   Current and Historical Financial Conditions ................................................................ 10
III. SUMMARY OF THE PLAN OF REORGANIZATION .......................................................... 11
     A.   What is the Purpose of the Plan of Reorganization?..................................................... 11
     B.   Unclassified Claims. ..................................................................................................... 11
          1.   **Administrative Expenses.** ............................................................................... 11
          2.   **Priority Tax Claims.** ....................................................................................... 11
     C.   Classes of Claims and Equity Interests. ........................................................................ 11
          1.   **Classes of Secured Claims** ............................................................................. 11
          2.   **Classes of Priority Unsecured Claims.** .......................................................... 12
          3.   **Classes of General Unsecured Claims.** ......................................................... 12
          4.   **Class of Equity Interest Holders.** ................................................................... 14
     D.   Means of Implementing the Plan. ................................................................................. 14
          1.   **Source of Payments.** ...................................................................................... 14
          2.   **Post-confirmation Management.** ................................................................... 14
     E.   Risk Factors. .................................................................................................................. 14
     F.   Executory Contracts and Unexpired Leases ................................................................. 15
     G.   Tax Consequences of Plan. ........................................................................................... 15
IV.  CONFIRMATION REQUIREMENTS AND PROCEDURES. ................................................ 16
     A.   Who May Vote or Object. ............................................................................................. 16
          1.   **What Is an Allowed Claim or an Allowed Equity Interest?** ............................. 16
          2.   **What Is an Impaired Claim or Impaired Equity Interest?** ............................... 17

        3.    **Who is Not Entitled to Vote.** ............................................................................... 17
        4.    **Who Can Vote in More Than One Class.**........................................................... 17
    B.    Votes Necessary to Confirm the Plan.......................................................................... 17
        1.    **Votes Necessary for a Class to Accept the Plan.** ................................................ 17
        2.    **Treatment of Nonaccepting Classes.**................................................................. 18
    C.    Liquidation Analysis. ................................................................................................... 18
    D.    Feasibility..................................................................................................................... 18
V.    EFFECT OF CONFIRMATION OF PLAN.......................................................................... 19
    A.    DISCHARGE OF DEBTOR....................................................................................... 19
    B.    Modification of Plan. ................................................................................................... 19
    C.    Final Decree................................................................................................................. 19

**I.     INTRODUCTION.**

This is the disclosure statement (the "Disclosure Statement") in the chapter 11 case of EFRAIN A. RIVERA SOLER, and BRENDA L. NIEVES CASTRO (the ADebtors@). This Disclosure Statement contains information about the Debtors and describes "DEBTORS' PLAN OF REORGANIZATION DATED September 1, 2010" (the "Plan"). A full copy of the Plan is attached to this Disclosure Statement as Exhibit A. *Your rights may be affected. You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one.*

Attached as appendixes and exhibits to this Disclosure statement are copies of the following documents:

(a) the Chapter 11 Plan of Reorganization (the "Plan") ***Exhibit A.***

(b) the Liquidation Analysis, which sets forth estimated recoveries in a Chapter 7 liquidation as compared to a Chapter 11 liquidation. ***Exhibit B***.

(c) The Projected Cash Flows for the five annual periods comprising the plan. ***Exhibit C.***

(d) The Claims reconciliation. ***Exhibit D.***

(e) Residential Appraisal Report for Debtors' home located at Santa Maria, San Juan, Puerto Rico. ***Exhibit E.***

(f) Appraisal Report for vacant lot located at Ponce, Puerto Rico. ***Exhibit F.***

(g) Financial Statement of Estancias del Señorial, Inc. ***Exhibit G.***

(h) Financial Statement of GEB Development, Corp. ***Exhibit H.***

(i) Financial Statement of Desarrolladora Internacional, Inc. ***Exhibit I.***

(j) Financial Statement of Mediterranium at Punta las Marías, Inc. ***Exhibit J.***

(k) Financial Statement of GW Construction, Corp. ***Exhibit K.***

(l) Debtors' most recent financial statement. ***Exhibit L.***

(m) Debtors' most recent Monthly Operating Report. ***Exhibit M.***

(n) Complaint in the case of <u>GEB, et als v. Erluca, Et als.,</u> KAC 2005-8146. ***Exhibit N.***

(o) Ballot for the acceptance or rejection of the Plan of Reorganization. ***Exhibit O.***

No representations concerning the debtor, including the Debtors' future operations or the value of property, are authorized other than as set forth in this statement. Any representation, warranty, agreement or inducement other than as contained in this statement, made to secure acceptance or rejection of the Plan by Debtors' creditors should not be relied upon in voting on the Plan.

The information contained herein has not been subject to certified audit for the foregoing reason: the debtors are unable to warrant or represent that the information contained herein is without any inaccuracy, although great efforts have been made to be accurate.

The proposed distributions under the Plan are discussed at pages 11-14 of this Disclosure Statement.

### A. Purpose of This Document.

This Disclosure Statement describes:

- The Debtor and significant events during the bankruptcy case,
- How the Plan proposes to treat claims of the type you hold (*i.e.*, what you will receive on your claim or equity interest if the plan is confirmed),
- Who can vote on or object to the Plan,
- What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan,
- Why the Debtors believe the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation, and
- The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement. This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

### B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing.

The Court has not yet confirmed the Plan described in this Disclosure Statement. This section describes the procedures pursuant to which the Plan will or will not be confirmed.

#### 1. *Time and Place of the Hearing to finally approve this Disclosure Statement and Confirm the Plan.*

The hearing at which the Court will determine whether to finally approve this Disclosure Statement and confirm the Plan will take in Judge Enrique Lamoutte's Courtroom, at 300 Recinto Sur Street, San Juan, Puerto Rico 00901 at the date and time set by Order of the Court.

#### 2. *Deadline For Voting to Accept or Reject the Plan.*

If you are entitled to vote to accept or reject the plan, vote on the enclosed ballot and return the ballot if by regular mail to Almeida & Dávila, PSC at PO BOX 191757, San Juan, PR 00919-1757, or if by email in PDF format to info@almeidadavila.com. See section IV.A. below for a discussion of voting eligibility requirements. Your ballot must be received by **10 days before the confirmation hearing** or any other time fixed by the Court, or it will not be counted, unless the Bankruptcy Court so orders. Debtors recommend a vote for "ACCEPTANCE" of the Plan.

        **3.**     *Deadline For Objecting to the Adequacy of Disclosure and Confirmation of the Plan.*

Objections to this Disclosure Statement or to the confirmation of the Plan must be filed with the Court and served upon the US Trustee, the Debtors and any other party in interest by the time fixed by the Court once it approves the disclosure statement.

        **4.**     *Identity of Person to Contact for More Information.*

If you want additional information about the Plan, you should contact Almeida & Dávila, PSC, attorneys for the Debtors by mail at PO BOX 191757, San Juan, PR 00919-1757, or if by email in PDF format to info@almeidadavila.com.

**C.**     **Disclaimer.**

*The Court has /has not approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted. The Court's approval of this Disclosure Statement is subject to final approval at the hearing on confirmation of the Plan. Objections to the adequacy of this Disclosure Statement may be filed until the date fixed by the Court for such matter.*

**II.**     **BACKGROUND**

    **A.**     **Description and History of the Debtors and their Business.**

Mr. Efraín Rivera Soler is a natural person of legal age, resident of San Juan, Puerto Rico, and citizen of the United States of America. He was born on July 30, 1964 in Fajardo, Puerto Rico. Mr. Rivera obtained his high school diploma from University Gardens High School in San Juan, Puerto Rico in the year 1982. Thereafter he attended the Inter American University Metropolitan Campus where he studied Business Administration. From the year 1989 to the present he has been involved in the construction business working as a project manager, a general contractor, and a developer. Currently he is the president and manager of a construction company known as GW Construction, Corp. As part of his duties he is responsible for the overall distribution of projects, is in charge of foremen, of supervision, and project cost estimates. He is also responsible for establishing and developing the operational plans of the company and the budget necessary to achieve profitable operations and obtain maximum efficiency of the company.

Mrs. Brenda L. Nieves is a licensed real estate broker in Puerto Rico since the year 2000. She obtained a Bachelors Degree in Public Communications with a Major in Marketing and Advertising in the year 1995 from the University of Puerto Rico, Río Piedras Campus. After graduation she has worked for different companies in the

development of new images and products. Since the year 2001 she has been dedicated to the real estate market focusing on the sale of new housing projects, and more recently to the resale of residential units.

Their hard work over the years made Mr. Rivera and Mrs. Nieves very valuable businesspersons allowing them to have strong finances and high income. The Debtors started to experience financial turmoil in the year 2004. At that time one of Mr. Rivera's companies was general contractor to two new housing projects: Caminos Terraverde, and Chalets Paseo Real. First, the business was great. The company experienced growth, and the clients were paying well. Then later in the year 2004 the owners of such two housing projects did not pay pending certifications and withheld the retainage owed to the company. The company had to incur in unexpected legal fees to initiate and prosecute a complaint against the owners of the projects. In turn, such unanticipated costs, left the company without sufficient cash flow to finance new construction projects.

In the year 2006 Mr. Rivera and Mrs. Nieves, through another one of their companies, then decided to venture in the development of small housing projects. At the time they had expectations of high returns on their investments. Their projects were completely sold during the pre-sale, and in addition to the income expected from the sale of the units, Mrs. Nieves also expected to receive income from commissions since she would serve as the real estate broker for the projects. All was going well until the fall of the housing market in Puerto Rico during the year 2007. Suddenly, the potential buyers were being denied financing from the banks, others were canceling their option to buy agreements, and new potential buyers were few and far between. They sought, but were denied, additional assistance from the banks that were financing the projects.

Since 2008, and after understanding that the banks were not willing to back them in order to finish construction on those projects, Mr. Rivera decided to return full time to providing professional services to GW Construction and Mrs. Nieves to her business of reselling and renting residential property through which she currently has listings of various properties located in Puerto Rico.

Attached as *Exhibit K* are compiled financial statements of GW Construction, which demonstrate that the corporation is in good financial health. Moreover, GW Construction has various contacts with the Municipality of Carolina, and is actively seeking participation in public works, and quoting private construction works. GW Construction further expects to sign an agreement with a large company towards the end of this year, to make large scale remodeling works in their premises.

**B.  Property of the Debtors.**

Debtors own two real properties: one residential property in San Juan, Puerto Rico and one vacant lot in Ponce Puerto Rico, the description of which is as follows:

a.  Residential Property located at #46 Malva Street, Ext. Santa María, San Juan, Puerto Rico with a lot of approximately 1,076.58 square meters and a residential structure of approximately 3,613 square feet. This property has a market value of $904,000 as per an Appraisal report made by Ismael Isern Suarez on

May 13, 2010. **Exhibit E.** This property is encumbered by a mortgage note for the amount of $665,987.00 held by Citimortgage. This property is being used as the residence of the Debtors and their minor son.

        b.        Vacant Land located at the end of 25 de Enero Street, Segundo Ward, Ponce, Puerto Rico sized as 24,540 square meters (6.244 "cuerdas"). This property has vacant and abandoned structures that should be demolished. This land was originally purchased to be developed. The proposed development was approved by permit number 10AL7-00000-00678 for 224 condominium units divided into five buildings of six levels each. Taking the permits into consideration, this property has a market value to a single purchaser of $1,800,000.00 as per an Appraisal report made by Ismael Isern Suarez on June 9, 2010. **Exhibit F.** This property is encumbered by a mortgage note for the amount of $931,975.09 held by RG Premier Bank. This property is not being used by the Debtors.

        **C.**        **Pending Litigation.**

As follows is the status of the case pending against, and on behalf of the debtors.

        1.        <u>GEB Development Corp, Rivera Soler and Nieves v. Erluca, Inc., Et Als.,</u> KAC 2005-8146 at the First Instance Court of San Juan, Puerto Rico for collection and damages. **Exhibit N.** In the year 2005 the Debtors and GEB Development, Corp. ("GEB") initiated an action against Erluca, Inc., Caminos Terraverde, SE, Newport Bonding, Doral Bank, Carlos Gonzalez, and his wife Nitza Barreto for default of a construction contract, collection and damages. In particular, the Plaintiffs alleged that around the October 17, 2002 and September 3, 2003 GEB Development Corp. entered into construction contacts to serve as a general contractor for two projects: Caminos Terraverde, and Chalets Paseo Real.

Simultaneously with the construction of such projects, Carlos Gonzalez (who is shareholder of Caminos Terraverde, SE, and Erluca, Inc., the corporations who owned the projects), asked GEB and Mr. Efrain Rivera to make some remodeling works to his home and office. Mr. Rivera was later told that for such remodeling works he would be paid from the corporations who own the projects. Mr. Rivera refused and asked to be paid with Mr. Gonzalez' personal money. Since Mr. Rivera had not received payment for the remodeling works, on August 8, 2004 he made a collection effort against Mr. Gonzalez. After that, Mr. Gonzalez was angry and retaliated against Mr. Rivera, and GEB with respect to the general construction contract of the two mentioned projects, up to the point of declaring GEB in default of the construction agreements. After the default declaration GEB was forced out of the projects. That, in turn, caused many suppliers and subcontractors of GEB to sue GEB, Mr. Rivera, and Mrs. Nieves to collect for work performed and supplies provided in those two projects.

Additionally, Newport Bonding defaulted in its duty as GEB's bonding company since it continued performance of the construction work for the projects without taking into consideration the rights, and defenses that GEB had against Erluca, and Terraverde. The Rivera-Nieves Family suffered damages as a result of Newport's acts since they had provided a personal guaranty to Newport for the Bond. For that reason, they are

seeking payment of $1,500,000 from Newport. Any amounts recovered in this proceeding would be used to fund the Plan of Reorganization.

The case is pending before the Puerto Rico state court. The pretrial conference was held on May 18, 2010. A Trial date has not been set. Debtors currently do not have an attorney to represent them in that proceeding and have been denied additional time to hire an attorney. Nevertheless, the Debtors will continue to prosecute the action.

2. *Baez Loureiro v. Desarrolladora, Int'l et als.*, KCD 2009-3611 at the First Instance Court of San Juan, Puerto Rico. In the year 2009 the Debtors, and others, were sued for collection of money and damages by Pablo Jesus Baez Loureiro. Baez claimed that he is owed a total of $165,000.00 plus interest, damages, costs and attorneys fees since Baez lent Desarrolladora Internacional $100,000 which would be paid with $5,000 monthly interests, and a $5,000 monthly late fee. Baez alleges that the Debtors were guarantors of such loan. The Debtors contested the allegations. This case is stayed against the Debtors because of the filing of the instant bankruptcy proceeding.

3. *Hormigonera Mayaguezana, Inc. v. GEB Development, Corp, et als.,* K CD2006-0186 at the First Instance Court of San Juan, Puerto Rico for collection. In the year 2006 Hormigonera Mayaguezana, Inc. ("HM") sued the Debtors, GEB Development Corporation, Newport Bonding and Surety Company, and unknown defendants in a collection action. HM claimed that it is owed $150,864.11 for premixed cement supplied for two construction projects: Camino Terra Verde, and Chalets de Paseo Real. HM alleged that the Debtor was a guarantor of such obligation. The Debtors contested the allegations. This case is stayed against the Debtors because of the filing of the instant bankruptcy proceeding.

4. *Easy Rental Equipment, Inc. v. GEB Development, Corp, et als.,* KCD04-1034 at the First Instance Court of San Juan, Puerto Rico for collection. In the year 2004 Easy Rental Equipment ("ERE") sued the Debtors, and GEB Development, and unknown defendants in collection of money. ERE claimed that it is owed $58,411.25 for under a rental agreement for heavy machinery, plus damages, interests, costs and attorneys fees. The Debtors contested the allegations. This case is stayed against the Debtors because of the filing of the instant bankruptcy proceeding.

**D.     Insiders of the Debtors.**

Debtors' only insiders are their family members, and Debtors' corporations: Estancias del Señorial, Inc., GEB Development, Corp., Desarrolladora Internacional, Inc., Mediterranium at Punta las Marías, Inc., and GW Construction, Corp. Debtors are not in any type of partnership with third parties. Neither during the two years prior to the commencement of the Debtor's bankruptcy case, nor during the duration of this Chapter 11 case have the debtors made cash payments to insiders.

### E. Events Leading to Chapter 11 Filing.

The company which provided the Debtors with most of their income was terminated from the two largest and most important construction projects it had. After that, even when Debtors tried to recuperate their financial status through various new business ventures, they were hit with the fall of the housing market which left them unable to return to their prior financial health. Moreover, After the termination of the Caminos Terraverde, and Chalets Paseo Real projects, the Debtors personally were faced with may lawsuits from the suppliers and subcontractors of those projects. Many of them obtained judgments against the Debtors, which the Debtors could not pay. Being faced with a decreased income, increase in liabilities which were payable in lump sum, and with a judicial lien that was placed on their home, Debtors felt their only hope was the filing of the instant bankruptcy in order to pay their creditors as part of a plan over a period of several years.

### F. Significant Events During the Bankruptcy Case

*Professionals Approved by the Court*

Since November 5, 2009, as approved by the Court on December 22, 2009, Debtor's attorney has been and continues to be Almeida & Dávila P.S.C.

On February 25, 2010 this Honorable Court approved the firm Cordero CPA & Co. PSC as debtors accountant. However, this firm is not currently providing services to the debtors. Debtors' accountant in the instant bankruptcy proceeding is Mr. José Armando López Haddock. Since April 28, 2010, as approved by the Court, Debtors' accountant has been and continues to be José Armando López Haddock. Mr. López maintains an office for the practice of accounting and financial consulting which is located at Caguas, Puerto Rico. Mr. López is currently preparing Debtors' monthly operating reports and has prepared the Analysis and Projections enclosed herein.

Debtors have been filing Monthly Operating Reports with the Bankruptcy Court reflecting Debtors' income and disbursements, as well as other items during the period of November 2009 to June 2010. The Monthly Operating Reports can be inspected by parties in interest at the Office of the Clerk of the Bankruptcy Court, and through the Court's CM/ECF system.

*Adversary Proceedings*

On March 29, 2010 debtors filed an adversary proceeding against Mr. Gregorio Zayas Ortiz, entitled <u>Efrain Rivera Soler and Brenda L. Nieves v. Gregorio Zayas Ortiz</u>, 10-00048, to set aside a preference that occurred when defendant registered a judicial lien into the Registry of the Property over debtors' residence within the 90 days prior to their filing of the instant voluntary case.

Defendant did not appear to answer or otherwise plead to the Complaint. Thus, on July 21, 2010 this Honorable Court entered default against the defendant pursuant to Federal Rule of Bankruptcy Procedure 7055.

The parties are in the process of drafting and presenting with the Court a request for Entry of Judgment by Stipulation wherein defendant recognizes that his claim is unsecured and that the judicial lien over debtors' residence is inexistent.

G. **Projected Recovery of Avoidable Transfers**

There were no payments made to any creditor within 90 days immediately preceding the commencement of this case.

The Debtors do not estimate to recover any cash amount from recovery of preferential or avoidable transfers. However, debtors estimate that the equity amount of their residential property will remain as it is presented in the liquidation analysis enclosed herewith inasmuch as such property is clear from any pre-petition judicial lien presented by Mr. Gregorio Zayas Ortiz.

H. **Claims Objections**

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtors reserve the right to object to claims. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. The procedures for resolving disputed claims are set forth in Article V of the Plan.

I. **Current and Historical Financial Conditions**

The identity and fair market value of the estate=s assets are evidenced through *Exhibits E-K*.

The Debtor=s most recent financial statements issued after bankruptcy is set forth in *Exhibit L*.

The most recent post-petition operating report filed since the commencement of the Debtors' bankruptcy case is set forth in *Exhibit M*.

Since the filing of the instant bankruptcy, Debtors' income and expenses have been as follows:

| *Date* | *Income* | *Expenses* | *Docket No.* |
|---|---|---|---|
| November 2009 | 0 | 491.45 | 44 |
| December 2009 | 29,100.00 | 3,629.88 | 45 |
| January 2010 | 500.00 | 770.04 | 55 |
| February 2010 | 11,773.91 | 21,051.82 | 87 |
| March 2010 | 6,364.66 | 12,841.03 | 88 |
| April 2010 | 10,374.53 | 13,829.06 | 102 |
| May 2010 | 8,650.68 | 9,862.85 | 110 |
| June 2010 | 5,945.39 | 7,831.13 | 115 |

Commencing on September 2010 Debtor will obtain a regular professional services payment from GW Construction of $5,000.00. After such change, Debtors' expect their monthly disposable income to be $1,300.00 for the first year of the plan, and later $2,400 through the remaining four years of the Plan.

**III.    SUMMARY OF THE PLAN OF REORGANIZATION**

    **A.    What is the Purpose of the Plan of Reorganization?**

As required by the Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive.  The Plan also states whether each class of claims or equity interests is impaired or unimpaired.  If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

    **B.    Unclassified Claims.**

Certain types of claims are automatically entitled to specific treatment under the Code.  They are not considered impaired, and holders of such claims do not vote on the Plan.  They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code.  As such, the Plan Proponent has *not* placed the following claims in any class:

        *1.    Administrative Expenses.*

Administrative expenses are costs or expenses of administering the Debtor=s chapter 11 case which are allowed under § 507(a)(2) of the Code.  Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition.  The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists the Debtor=s estimated administrative expenses, and their proposed treatment under the Plan: a) Professional fees of approximately $25,000.00 will be paid in full on the effective date of the Plan, or according to separate written agreement, or according to court order if such fees have not been approved by the Court on the effective date of the Plan; b) Office of the U.S. Trustee Fees of approximately $500.00 will be paid in full when due or on the effective date of the Plan.

        *2.    Priority Tax Claims.*

Priority tax claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code.  Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding 5 years from the order of relief.  Debtor=s are not estimating § 507(a)(8) priority tax claims, as they do not have such type of debt.

    **C.    Classes of Claims and Equity Interests.**

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

        *1.    Classes of Secured Claims*

Allowed Secured Claims are claims secured by property of the Debtor=s bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code. Following are all classes containing Debtor=s secured prepetition claims and their proposed treatment under the Plan:

**Class 1 – Secured Claim: Citimortgage.**

Class 1 includes Claim #17 of Citimortgage, and is secured over debtor's home located at #46 Malva Street Ext. Santa Maria Development, San Juan, Puerto Rico. The appraised value of this property is $904,000.00, as of May 13, 2010.

Citimortgage will be paid by the debtors in accordance to a mortgage modification approved by the Honorable Bankruptcy Court and entered into between the Debtors and the Creditor during the year 2010. According to such modification, the Debtors will pay monthly installments of $895.00. After five years the monthly installments may be modified by further agreement of the parties, and will continue to be made by the Debtors until full satisfaction of such claim. Prepetition arrears on Class 1 Claim were included in the mortgage modification.

Class 1 will retain its lien over Debtor's property until all contractual payments are satisfied, and is not impaired under the Plan.

**Class 2 – Secured Claim: RG Premier Bank.**

Class 2 includes Claim #12 of RG Premier Bank, and is secured over debtor's real vacant land located at the end of 25 de enero Street, Segundo Ward, Ponce, Puerto Rico. The appraised value of this property is $1,800,000.00, as of June 9, 2010.

Debtors will satisfy this claim by the surrender of the collateral securing such claim to the Creditor.

Class 2 will retain its lien over Debtor's property, and is not impaired.

2. *Classes of Priority Unsecured Claims.*

Certain priority claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Code are required to be placed in classes. The Code requires that each holder of such a claim receive cash on the effective date of the Plan equal to the allowed amount of such claim. However, a class of holders of such claims may vote to accept different treatment. However, in the instant bankruptcy case there are no such priority claims.

3. *Classes of General Unsecured Claims.*

General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code. There is no §1122(b) convenience class in Debtors' Plan.

Following are all classes containing Debtor=s unsecured prepetition claims and their proposed treatment under the Plan:

**Class 3 – Unsecured Claims: Eurobank Construction Loans.**

Class 3 includes Claims #20, and #28 of Eurobank, for construction loans where the debtors are co debtors to third party Desarrolladora Internacional and for which such third party granted the creditor real property as collateral to such claims.

Class 3 will be satisfied by the third party's surrender of the collateral securing such claim.

Class 3 as allowed, is impaired under the Plan, and therefore has a right to vote.

**Class 4 – General Unsecured Claims**

Class 4 includes the claims of General Unsecured Creditors not included in other classes, as allowed, approved and ordered paid by the Court, under § 502 of the Code.

Class 4 shall be paid in an amount equal to 1.6% of the allowed amount of such claim, in 60 monthly installments as follows, unless the holder of such claim agrees with the Debtors to a different treatment:

$1,134.00 for 1 month to commence on November 1, 2010

$1,300.00 for 12 months to commence on December 1, 2010, and

$2,400.25 for 48 months to commence on November 1, 2011.

On the effective date, each Class 4 creditor, whose claim is allowed, will receive a non-negotiable, non-interest bearing note providing for payment of 1.6% of their claim, payable as above stated before the expiration of the 60 month period of this Plan. Creditors with disputed, contingent and/or unliquidated claims, at the effective date, will receive such note whenever their claims become allowed claims.

Any amounts collected by the Debtors from the Erluca litigation during the life of the plan will be used as additional income to fund the plan.

Class 4 as allowed and ordered paid by the Court is impaired under the Plan, and therefore has a right to vote.

**Class 5 – Claim of First Bank for Auto Lease**

Class 5 includes the claim of First Bank for an auto lease, as allowed, approved and ordered paid by the Court.

Class 5 will continue to be paid by the debtors as per the leasing agreement in force, which is also being assumed. According to such agreement, the Debtors will continue to pay monthly installments of $698.00 until the maturity date of the lease.

Class 5 will receive distribution under the Plan equal to the prepetition arrears of $1,465.80, and will receive such payment in a lump sum paid on the effective date of the Plan.

If debtor fails to make two (2) post confirmation payments or surrenders to First Bank for this leasing agreement, the automatic stay will be lifted in favor of First Bank. First Bank may charge the total unpaid balance to any joint guarantor of the debtor. If debtor satisfies the full debt as agreed herein, any joint guarantor will be relieved from paying the full amount of First Bank's claim.

The Debtor will provide First Bank evidence of insurance coverage on or before January 1, 2011, and respectively for every year until the full payment of the lease for the vehicle. The Debtor will not use an insurance certificate issued by an insurance agency as evidence of compliance. The Debtor will also produce to First Bank a copy of the complete insurance policy and the insurance company agent name and telephone number.

Class 5 will retain ownership of the vehicle subject of the lease agreement until all proposed payments under this plan, and under the original leasing agreement are satisfied. Thereafter the claim will be deemed satisfied and liquidated in full, and the title of the property will be transferred by First Bank to the Debtors.

Class 5 as allowed and ordered paid by the Court is not impaired under the Plan, and therefore does not have a right to vote.

### 4.  *Class of Equity Interest Holders.*

Equity interest holders are parties who hold an ownership interest (*i.e.*, equity interest) in the Debtor. In a corporation, entities holding preferred or common stock are equity interest holders. In a partnership, equity interest holders include both general and limited partners. In a limited liability company ("LLC"), the equity interest holders are the members. Finally, with respect to an individual who is a debtor, the Debtor is the equity interest holder. However, in the instant bankruptcy case there are no such equity interest claims.

THE FOREGOING IS A BRIEF SUMMARY OF IMPORTANT DISPOSITIONS OF THE PLAN. CREDITORS ARE URGED TO READ THE PLAN IN FULL. THEY ARE FURTHER URGED TO CONSULT WITH COUNSEL, OR WITH EACH OTHER IN ORDER TO FULLY UNDERSTAND THE PLAN. THE PLAN IS COMPLEX INASMUCH AS IT REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT BY DEBTOR AND AN INTELLIGENT JUDGEMENT CONCERNING SUCH PLAN CANNOT BE MADE WIHTOUT UNDERSTANDING IT.

### D.  **Means of Implementing the Plan.**

#### 1.  *Source of Payments.*

Payments and distributions under the Plan will be funded by the following: the Debtor's and Joint Debtor's income for the 60 months beginning on October 1, 2010, which includes the income received from Debtor's professional services to GW Construction Corp., and of Joint Debtor's business as a real estate broker. As part of the plan, Debtors will continue to manage and operate the real estate broker business, and to provide professional services to GW Construction Corp. in order to finance the provisions of the Chapter 11 Plan. Estimated income projections are included in the Disclosure Statement.

Moreover, the Plan will also be funded from any income obtained by the Debtors from the litigation proceeding they are prosecuting against Newport Bonding in the from which debtors are requesting payments for damages suffered of approximately $1,500,000.

#### 2.  *Post-confirmation Management.*

Post-Confirmation the Debtors will continue to manage their own affairs.

### E.  **Risk Factors.**

The proposed Plan has the regular business operations risk. Attached as ***Exhibit C*** are the Financial Projections of the Plan under the assumptions detailed herein. These include projected statement of operations and payment plans for all claims. While it cannot be foreseen with absolute certainty that the cash flow projections

which accompany this Disclosure Statement will be met, Debtors have no reason to believe that the contrary will be the case. Debtors understand that the Plan is confirmable for the benefit of their creditors.

The Projected Cash Flows for the Five Annual Periods Starting October 1, 2010 take into account the following assumptions:

1. Debtor will commence receiving a monthly professional services fixed income of $5,000.00 starting on September, 2010. They estimate that such income will increase by 1% yearly starting in the year 2011. Thus an increase in such income has been assumed for purposes of these projections.

2. Debtors also projects that revenue from joint debtor's business will also increase.

3. The projections also reflect the assumption that Debtors expenses will increase yearly.

**F.     Executory Contracts and Unexpired Leases**

The Plan, lists all executory contracts and unexpired leases that the Debtors will assume under the Plan. Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any. The Plan also lists how the Debtors will cure and compensate the other party to such contract or lease for any such defaults.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

Consult your adviser or attorney for more specific information about particular contracts or leases.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

**G.     Tax Consequences of Plan.**

***Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.***

The following are the anticipated tax consequences of the Plan:

The tax consequences of the Plan to the debtors would be to have to recognize income for any debt that is discharged by the plan inasmuch as the expenses related to such debt where taken as a tax deduction in prior years.

The general tax consequences for creditors would be that they in turn would get a tax deduction for any amounts they are not able to collect to the extent they reported such amounts as income in prior years, and if they take this deduction and later recover any amounts, such amounts would have to be reported as income.

In an event, creditors and equity interest holders concerned with how the Plan may affect their tax liability should consult with their own Accountants, Attorneys and/or Advisors.

**IV.** **CONFIRMATION REQUIREMENTS AND PROCEDURES.**

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code. These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible. These requirements are not the only requirements listed in § 1129, and they are not the only requirements for confirmation.

**A.** **Who May Vote or Object.**

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan Proponent believes that classes 3, and 4 are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan. The Plan Proponent believes that 1, 2, and 5 are unimpaired and that holders of claims in each of these classes, therefore, do not have the right to vote to accept or reject the Plan.

**1.** *What Is an Allowed Claim or an Allowed Equity Interest?*

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtor=s schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

*The deadline for filing a proof of claim in this case was March 14, 2010 for all creditors, except governmental units, and May 16, 2010 for all governmental units. For newly added creditors, the deadline for filing a proof of claim is 90 days after service of the Notice to New Creditor, which was served on August 27, 2010.*

*The deadline for filing objections to claims is 30 days before the Confirmation Hearing, or 30 days after the filing of the proof of claim, whichever is later.*

### 2. *What Is an Impaired Claim or Impaired Equity Interest?*

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is *impaired* under the Plan. As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

### 3. *Who is Not Entitled to Vote.*

The holders of the following five types of claims and equity interests are *not* entitled to vote:

- holders of claims and equity interests that have been disallowed by an order of the Court;
- holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes.
- holders of claims or equity interests in unimpaired classes;
- holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code; and;
- holders of claims or equity interests in classes that do not receive or retain any value under the Plan;
- administrative expenses.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan and to the Adequacy of the Disclosure Statement.***

### 4. *Who Can Vote in More Than One Class.*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

### B. **Votes Necessary to Confirm the Plan.**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes, as discussed later in this Section.

### 1. *Votes Necessary for a Class to Accept the Plan.*

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

### 2. *Treatment of Nonaccepting Classes.*

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by § 1129(b) of the Code. A plan that binds nonaccepting classes is commonly referred to as a Acram down@ plan. The Code allows the Plan to bind nonaccepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not Adiscriminate unfairly,@ and is Afair and equitable@ toward each impaired class that has not voted to accept the Plan.

*You should consult your own attorney if a Acram down@confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.*

### C. Liquidation Analysis.

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. A liquidation analysis is attached to this Disclosure Statement as *Exhibit B.*

### D. Feasibility.

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

The Plan Proponent has provided projected financial information. Those projections are listed in *Exhibit C*.

The Plan Proponent's financial projections show that the Debtors will have an aggregate annual average cash flow, after paying operating expenses, plan payments, and post-confirmation taxes of $2,359.00. The final Plan payment is expected to be paid on September, 2015.

The assumptions taken into account of the financial projections of the Debtors are that:

1. Debtor will commence receiving a monthly professional services income of $5,000.00 starting on September, 2010. They estimate that such income will increase by 1% yearly starting in the year 2011. Thus an increase in such income has been assumed for purposes of these projections.

2. Debtors also projects that revenue from joint debtor's business will also increase.

3. The projections also reflect the assumption that Debtors expenses will increase yearly proportionally with their increase in income, due to inflation.

*You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.*

**V.     EFFECT OF CONFIRMATION OF PLAN.**

   **A.     DISCHARGE OF DEBTOR.**

The Debtors are individuals and § 1141(d)(3) is not applicable. Confirmation of this Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments under this Plan, or as otherwise provided in § 1141(d)(5) of the Code. The Debtor will not be discharged from any debt excepted from discharge under § 523 of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

Discharge of Claims.     Except as otherwise expressly provided herein, by the Bankruptcy Code or in the Confirmation Order, the rights granted by this Plan and the payments and distributions made hereunder shall be in complete exchange for and in full and final satisfaction, settlement, release and discharge of all existing debts and Claims of any kind, nature or description whatsoever against the Debtors or the Debtors in Possession, or the Reorganized Debtors, or any of their assets or properties; and on the Consummation Date, all existing Claims against the Debtor or Debtor in Possession shall be, and shall be deemed to be, exchanged, satisfied, discharged and released in full; and all holders of Claims shall be precluded from asserting against the Debtors and the Reorganized Debtors, or their assets or properties any other or further Claim based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Consummation Date, whether or not such holder filed a proof of claim; whether or not such Claim is allowed, and whether or not the holder of such Claim has accepted the Plan.

   **B.     Modification of Plan.**

The Plan Proponent may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or revoting on the Plan.

Upon request of the Debtor, the United States trustee, or the holder of an allowed unsecured claim, the Plan may be modified at any time after confirmation of the Plan but before the completion of payments under the Plan, to (1) increase or reduce the amount of payments under the Plan on claims of a particular class, (2) extend or reduce the time period for such payments, or (3) alter the amount of distribution to a creditor whose claim is provided for by the Plan to the extent necessary to take account of any payment of the claim made other than under the Plan.

   **C.     Final Decree.**

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Plan Proponent, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 1st day of September, 2010.

And

By: ___*S/ Efraín A. Rivera Soler*_____    By: __*S/ Brenda L. Nieves Castro*_____

    EFRAIN A. RIVERA SOLER                   BRENDA L. NIEVES CASTRO

I HEREBY CERTIFY that on this date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all CM/ECF participants including the U.S. Trustee.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 1st day of September 2010.

                                               **ALMEIDA & DÁVILA, P.S.C.**
PO Box 191757
San Juan, Puerto Rico 00919-1757
Phone: (787) 722-2500
Fax: (787) 722-2227

S/**ENRIQUE M. ALMEIDA BERNAL**
USDC-PR 217701
Email: ealmeida@almeidadavila.com

S/ **ZELMA DÁVILA CARRASQUILLO**
USDC-PR 218913
Email: zdavila@almeidadavila.com